**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------X
**YAINIS YNOA and IRIS INOA,**

                                      **Case No.:** 1:20-cv-2594

                **Plaintiffs,**

     -against-

**PRESSLER, FELT & WARSHAW, LLP,**
**MIDLAND FUNDING, LLC, and**
**MIDLAND CREDIT MANAGEMENT, INC.**
                **Defendants.**
-------------------------------------------------------------------X

## ORIGINAL COMPLAINT AND JURY DEMAND

Plaintiffs Yainis Ynoa and Iris Inoa bring suit against Defendants for their violations of the Fair Debt Collections Practices Act, 15 U.S.C. § 1692 et seq. and for conversion, and in support would show as follows.

## JURISDICTION AND VENUE

1. This Court has jurisdiction pursuant to 15 U.S.C. § 1692k(d) and 28 U.S.C. § 1337. Declaratory relief is available pursuant to 28 U.S.C. §§ 2201 and 2202.

2. The Court has federal question jurisdiction over the lawsuit because the action arises under the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692, et seq. Jurisdiction of the Court arises under 28 U.S.C. § 1331 in that this dispute involves predominant issues of federal law, the FDCPA. The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiffs's state law claims because said claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

3. Venue in this district is proper because all or a substantial part of the events or omissions

giving rise to the claims occurred in Bronx County, New York.

## PARTIES

4.      Plaintiff Iris Inoa is an individual who resides in Bronx County, New York. She is a "consumer" as defined by 15 U.S.C. § 1692a(3) because Ms. Inoa had allegedly owed consumer credit card debt, which constitutes a "debt" under 15 U.S.C. § 1692a(5). Plaintiff Yainis Ynoa is her daughter and also an individual who resides in Bronx County, New York.

5.      Defendant Pressler, Feltman & Warshaw, LLP ("Pressler") is a debt collection law firm with its principal place of business at 305 Broadway, 9th Floor, New York, New York 10007. It is a "debt collector" as defined under 15 U.S.C. § 1692a(6) because it uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts.  Further, Pressler is a debt collector because it regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.

6.      Defendant Midland Funding LLC ("MF") is a foreign limited liability company organized and existing under the laws of the state of Delaware. MF engages in business in New York and maintains a designated agent for service of process in New York. This suit arose out of said Defendant's business in New York.

7.      MF has no employees.

8.      MF's principal (indeed sole) purpose is to purchase charged off consumer accounts, or putative judgments obtained on those accounts, after they are in default with the putative original creditor and have those debts collected upon. MF is therefore a "debt collector" as defined in 15 U.S.C. § 1692a(6).

9.                                                      MF then files collection lawsuits to collect on

the consumer accounts it purchases through law firms like Pressler. Because Pressler collected on the account at issue on behalf of MF, it is hence incorporated by reference that unless stated otherwise MF is jointly and severally liable for the conduct of Pressler in the attempts to collect the putative debt. MF is the plaintiff in tens of thousands – if not hundreds of thousands -- of consumer credit lawsuits, and has the resulting judgments collected upon via wage garnishments, information subpoenas and bank restraints.

10. Defendant Midland Credit Management, Inc. ("MCM") is a Kansas corporation with its principal place of business also located at 8875 Aero Drive, San Diego, CA 92123. MCM does business in the state of New York.

11. MCM holds a collection agency license from the New York City Department of Consumer Affairs.

12. MCM is the servicer for MF.  While collection lawsuits are filed in the name of MF, the owner of the putative debt, the affirmative collection attempts to collect that debt are taken by MCM. These affirmative steps include the sending of collection letters, the making of collection phone calls, and arranging for the retention of collection law firms such as Pressler to file suits in the name of MF, and to collect upon the resulting judgments by collection letters, wage garnishments, information subpoenas and bank restraints..   MCM regularly takes these debt collection actions, and that is its principal (indeed sole) purpose

13. MCM and MF use the mails and telephone system to conduct its business.

14. MCM and MF are each a "debt collector" as defined in the FDCPA, 15 U.S.C. § 1692a(6).

15. MCM and MF engages in business in the State of New York, and this suit arose out of MCM's business in New York.

16. For the reasons stated above, MF and MCM operate as a joint venture to collect putative debts.

MCM acts as the agent of MF acting within the course and scope of that agency. For these reasons, this complaint will use the term "Midland Defendants" or "Midland" to refer to them jointly and severally.

17. Pressler was the free chosen law firm of Midland. Pressler was the agent of Midland acting in the course and scope of that agency. For these reasons and others, Midland is jointly and severally liable for the acts Pressler on behalf of Midland. Therefore, when acts are taken by Pressler on behalf of Midland this complaint will at times simply identify those acts of Defendants, jointly and severally.

## FACTUAL ALLEGATIONS

### *Default judgment on Iris Inoa*

18. On January 14, 2009, Midland through Pressler sued Plaintiff Iris Inoa over a putative consumer credit card debt in Bronx Civil County Court, captioned *Midland Funding, LLC, DBA in New York as Midland Funding of Delaware, LLC v. Iris J. Inoa,* CV-004673-09/BX ("the Lawsuit") *See* **Exhibit A** (eCourts).

19. On June 19, 2009, Midland through Pressler entered a judgment against Ms. Inoa.

20. Iris Inoa does not know if she was ever served with the Lawsuit, which was filed 11 years ago.

21. However, she does remember having credit card problems in 2005. She vaguely recalls getting a copy of a lawsuit many years ago but does not recall if it was the Lawsuit, or whether it was properly served. Ecourts indicates there is apparently a default judgment by a different lawsuit by a different putative creditor assignee, so that may have been the suit she received a copy of many years ago.

22. Only in the last month did Ms. Inoa realize that she had a legal right to seek to vacate the

judgment in the Lawsuit if the facts alleged in the affidavit of service were false and learned of a non-profit resource she could use to attempt to do so. Due to the COVID-19 outbreak, Ms. Inoa has not been able to retrieve the case file for the collection lawsuit prior to this filing.

23. Yainis Ynoa, Iris Inoa's daughter, was a child at this time, and obviously not involved in any alleged credit card debt against her mother.

### *Defendants restrain the money of non-judgment debtor Yainis Ynoa, all of which are exempt from restraint in any event*

24. On March 27, 2019, Pressler, on behalf of Midland, used the judgment to unlawfully restrain all of the money in Yainis Ynoa's bank account.

25. The bank restraint was unlawful in three ways. The first, and perhaps most obvious, was that the judgment was solely against Iris Inoa and not against Yainis Ynoa.

26. Upon information and belief, the account was disclosed in the information subpoena to JPMorgan Chase (**Exhibit B**) because Iris Inoa had helped Yainis Ynoa open the account when she was a minor and was still a secondary joint owner. However, all of the money in the account belonged to Yainis Ynoa, and she was the only person to use the account. The answer to the third question of the Information Subpoena, listing the last 3 direct deposits, would have shown (depending on what day between March 20 and March 27 the bank responded) either the March 19 or the March 26, 2019 deposits by the New York Department of Labor of Ms. Ynoa's unemployment payments.

27. The restraint was also unlawful because it restrained all of the money in Yainis Ynoa's account, approximately $5,566.17. Pressler's restraint was unlawful because all of the funds were exempt from restraint. The funds in the account consisted of eight weeks of unemployment

5

payments to Yainis Ynoa, a total of $3,384[1]. Under NY CPLR § 5205 et seq., unemployment insurance is exempt from restraint. Only $2,182.27 of the checking account was from a non-exempt source. Even there, the entire amount was exempt. Pursuant to NY CPLR 5205, approximately $3,240 in a bank account for a consumer in NYC in 2019 was exempt from restraint, even if the source of the funds were otherwise not exempt. Thus Defendants restrained all of the money in the account when it was prohibited from restraining any of the money in the account.

28. Yainis Ynoa learned of the restraint from an email from Chase. **Exhibit C** (Chase Notice of Restraint). The amount restrained, $22,495.08, was more money than she had seen in her life.[2] She cried and screamed because her money was gone due to an amount of money she could not possibly afford to pay. Initially she thought she had become the victim of identity theft.

29. Yainis Ynoa called Chase, but they did not give her anymore information than what was in the email, so she went into a branch, which is when she learned for the first time that a law firm Pressler had restrained the money due to an alleged debt.

> ***Yainis Ynoa puts Defendants on notice all of the money in the account is hers, and provides documentary proof of the same, and that the money is entirely exempt in any event.***

30. Soon thereafter she called Pressler to find out why her account had been restrained and how to get it released. Pressler told her that the legal hold was intended for Plaintiff Iris Inoa, her mother. Yainis Ynoa told Pressler that the account was hers and all the money that was in it

---

[1] All of the unemployment deposits would be counted towards the balance of the account by the lowest intermediate balance principle. As the Second Circuit noted in *Arias,* "exempt funds are the last funds to leave the account. For example, if $1,000 of exempt funds and $1,000 of non-exempt funds are deposited, and then $1,000 is withdrawn, the remaining $1,000 is exempt." *Arias v. Gutman, Mintz, Baker & Sonnenfeldt LLP*, 875 F.3d 128, 132 (2d Cir. 2017) *citing United States v. Banco Cafetero Panama*, 797 F.2d 1154, 1159 (2d Cir. 1986).

[2] The restraint is for twice the amount of the judgment.

belonged to her. Pressler told her that she had to send proof that the account was hers, but when Yainis Ynoa asked what proof was needed, Pressler only told her "Whatever you have."

31. This call made Yainis Ynoa very angry and frustrated, but nonetheless she put together 18 pages of documents, including three bank statements and her W2, and sent them to Pressler on March 29, 2019. **Exhibit D** (March 29 Fax Confirmation Sheet).

32. These bank statements, for December, January, and February, clearly show that the account contained unemployment insurance payments of $423 each. **Exhibit E** (December 2018, January and February 2019 bank statements). Most notably, four of the deposits shown in the statements were the $423 unemployment insurance deposits into her account by the New York State Department of Labor, which any experienced debt collector like Pressler would recognize by its description "NYS DOL UI DD UI DD." And as an experienced debt collector who has executed tens of thousands of bank restraints, Pressler would know that those unemployment funds were exempt from restraint.

33. Pressler should have, on this basis alone, released the account immediately, even if they continued to have doubts as to whether Yainis Ynoa was the primary owner.

34. Even if Pressler argues it did not know the restrained funds were exempt when it restrained the account, they ratified their misconduct after the March 29 Fax containing evidence that the funds belonged to Ms. Ynoa and contained unemployment insurance payments. They acted at their own peril at this point by not immediately releasing the funds. The fact that the improper restraint would pressure Iris Inoa into entering a payment plan casts further suspicion on their reason for not immediately releasing the funds.

35. Yainis Ynoa called soon thereafter to determine whether Pressler was satisfied and would

release her account. The first time she called, Pressler told her they had not processed the paperwork yet and to call back later. She called back and Pressler told her that the information she had sent was not enough, despite the documents showing both that the account was hers and that she had been having unemployment payments deposited into it. Additionally, Pressler told her it found transfers made to the account using the Chase Quickpay with Zelle Payment app to be suspicious.

36. Chase's Quickpay with Zelle Payment is an integrated application for making small money transfers, similar to Paypal or Venmo. It is unclear what good faith basis, if any, Pressler would have to find the use of this app suspicious.

37. Yainis Ynoa asked again what specific documentation they needed to determine the account was hers and Pressler told her, even less helpfully than before, that they did not know how she could prove that the transactions were not suspicious but that she needed to for them to determine that the account was hers.

38. Yainis Ynoa gathered even more information to send to Pressler. The first document, a Deposit Account Balance Summary, showed that Yainis Ynoa was the primary account owner and that her mother Iris Inoa was only a secondary account owner. **Exhibit F** (Deposit Account Balance Summary).

39. Yainis Ynoa also obtained her Checking Account Summary, which also showed that Yainis Ynoa was the primary owner and Iris Inoa only a secondary owner. Further, it showed that Yainis Ynoa was born in 1994, meaning that the account was opened when she was 16, corroborating that her mother was on the account to help Yainis open it as a minor. **Exhibit G** (Checking Account Summary).

40. Yainis Ynoa also obtained her Transaction History showing transactions immediately preceding the bank restraint on March 27. **Exhibit H** (Transaction History).

41. Yainis Ynoa asked her friend Maria to provide her with a notarized letter confirming that one of the transactions that Pressler alleged was "suspicious" was in fact from Maria and was "addressed to and intended for Yainis Ynoa." **Exhibit I** (Maria Letter). Having to disclose to her friend that she was dealing with this bank restraint, revealing personal details not only about herself but also about her mother Iris Inoa, was incredibly embarrassing and stressful for Yainis Ynoa.

42. Yainis Ynoa also had her boyfriend David to provide a similar notarized letter to confirm his own transactions with Yainis Ynoa. **Exhibit J** (David Letter). The situation was very stressful for the couple – David had already been stressed because of Yainis Ynoa being unemployed, and now that her bank account was frozen he was concerned about paying bills and rent by himself.

43. Lastly, Yainis Ynoa attached a "Payment Activity" document showing in more detail the allegedly "suspicious" transactions.

44. Yainis Ynoa faxed 18 pages, including those described above, to Pressler on April 5, 2019. **Exhibit K** (April 5 Fax Confirmation).

> ***Pressler acknowledges documents demonstrate all the money in the restrained account belonged to daughter but now mother needed to enter into payment plan and disclose extensive financial information documentation.***

45. On April 8 and 9, 2019, over a number of calls, Yainis called Pressler to determine if they were satisfied that documentation demonstrated all of the money in the bank account was hers. Pressler told her that the documentation was enough to show the account was hers, but that

9

Yainis Ynoa now needed to have her mother set up a payment plan.

46. Plaintiffs understood this to mean that Pressler would not release Yainis Ynoa's bank account until Iris Inoa set up a payment plan with Pressler. They were terrified.

47. Pressler demanded from Yainis Ynoa lots of personal and private information about her mother: (1) Iris Inoa's place of employment, (2) the address of her place of employment, (3) how many hours she worked, (4) what she does at work, (5) how much she makes an hour, (6) how much she makes every two weeks, (7) her account number and routing number, and (8) her social security number.

48. Pressler told Yainis Ynoa that her mother needed to pay $400 a month. Iris Inoa makes minimum wage ($15 an hour) for 31 hours a week as a home attendant, resulting in a take home pay of about $1,600 per month. With such a low income never has more than a few hundred dollars in her bank account at any time. Yainis Ynoa knew her mother could not afford that.

49. When Yainis Ynoa told Pressler that her mother could not afford $400 a month – a third of her monthly income -- Pressler told her that the lowest they could do was $200 a month. However, Pressler ominously warned, if Iris Inoa missed any payments, she would liable for the full amount of over $20,000. What that meant is unclear as Midland already had a judgment against Ms. Inoa for the full amount.

50. Plaintiffs Iris Inoa and Yainis Ynoa both believed that Iris Inoa had to enter into a payment plan with Pressler in order to have Yainis Ynoa's bank account released, when in fact the restraint was unlawful, should never have been made, and certainly should have been released when Pressler first had notice upon receipt of the March 29 fax that the account was Yainis Ynoa's, and contained unemployment insurance payments.

51. Iris Inoa would not have entered into a payment plan to make $200 a month payments on the putative debt but for the illegal restraint on her daughter's bank account. That duress was used by Pressler to first have Yainis Ynoa provide them with her mother's personal information and then to pressure Iris Inoa into a vague payment plan. Defendants never sent Plaintiffs anything in writing codifying the terms of the oral agreement, leaving Plaintiffs unsure of their rights and obligations, and creating additional pressure never to miss a payment.

52. After agreeing to the payment plan, Pressler finally released Yainis Ynoa's account on or around April 11, 2019.

53. Iris Inoa made the first payment pursuant to the $200 a month payment plan on April 25, 2019, and has been making timely payments pursuant to the plan from then until the present.

*Defendants' misconduct inflicted substantial damages on Plaintiffs*

54. Despite her checking account being released, Yainis Ynoa still feels like she is stuck paying for this debt that she never incurred because the payment plan that her mother agreed to under pressure is not actually affordable for her mother, so Yainis Ynoa makes monthly payments to her mother of $100 to pay for it. She feels guilty that releasing herself from the unjust restraint on her account seemed to require that the burden be placed on her mother.

55. Yainis Ynoa felt completely distressed until the restraint against her was lifted and her money was released.

56. Even when she was able to figure out a course of action of what to do, every time Pressler refused to give her specific information on how to fix the wrongful restraint, it stressed her out more.

57. Because Yainis Ynoa had been unemployed since on or around January 30, 2019, she had

11

to rely on her boyfriend and dig into her savings account to make ends meet, all due to a debt that she did not owe through a restraint that was improper on multiple grounds.

58. She couldn't sleep. She would call her mom every day, stressing out her mom who was herself feeling worried and guilty and did not understand why these things were happening. It was a strain on Plaintiffs' relationship.

59. Yainis and Iris Inoa would facetime, and Iris would be able to tell that Yainis had not been sleeping. Yainis felt manic, constantly thinking about the restraint and how she needed to fix it. It was a constant back and forth on her mind.

60. Yainis felt tired all the time. She tossed and turned a lot in her sleep, leading to many sleepless nights where she would wake up in the middle of the night, fall back asleep, and awaken again in a vicious cycle.

61. Even now, thinking about what happened to her gives Yainis anxiety. She is trying to fix her credit and the financial stress of these monthly payments is always in the back of her mind. Yainis wishes she could pay the whole thing for her mother.

62. Due to Pressler's deceptive and illegal restraints, Plaintiffs believe that if they miss a monthly payment that they will freeze Iris Inoa's bank account and would never remove the restraint, or would take her entire paychecks. Yainis worries that they will ruin her mother financially, and she cannot afford to support both herself and her mother.

63. Iris Inoa is, in fact, exempt from either bank restraints or wage garnishments because her bank balances and paychecks are so low. Pressler would not have been able to take this money from her through such means – they needed her to voluntarily agree to a payment plan, and by freezing her daughter's bank account, that is what they were able to do.

64. Iris Inoa says that the experienced made her almost die of nerves. She felt really guilty when her daughter first called to tell her about the bank restraint. Iris heard the angst and anger in her daughter's voice and it gave her stress headaches.

65. Iris Inoa would constantly be anxious during the restraint, waiting and worrying for the next phone call from her daughter to find out what happened.

66. Iris Inoa barely slept. She would get nightmares that people were knocking on her door and were going to kick her out of her apartment and take her stuff. She would not be able to fall asleep because she could not stop thinking about the situation. She would only be able to get to sleep by 3 AM, and since she woke up at 7 AM, she would only get around 4 hours of sleep a night. She had these kinds of nightmares every night until the bank account was released. But even though, the nightmares have merely shifted to being about not being able to make the unaffordable $200 a month payments that she agreed to in order to have her daughter's account released.

67. Iris Inoa's stress affected everything. The stress would hurt her stomach when she thought about it. She would take Tylenol for her stress headaches, which only stopped once her daughter's money was released. But even thinking about what happened to them for long enough brings back the headaches.

## FIRST CLAIM FOR RELIEF:
## VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT

68. Plaintiffs repeat and reallege each and every allegation set forth in the above paragraphs of this complaint as if fully set forth herein.

69. The purpose of the FDCPA is "to eliminate abusive debt collection practices by debt collectors, to insure that debt collectors who refrain from using abusive debt collection practices

are not competitively disadvantages, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692 (e); *see also Hamilton v. United Healthcare of La., Inc.* 310 F.3d 385, 392 (5th Cir. 2002) ("Congress, through the FDCPA, has legislatively expressed a strong public policy disfavoring dishonest, abusive, and unfair consumer debt collection practices, and clearly intended the FDCPA to have a broad remedial scope.").

70. Congress designed the FDCPA to be enforced primarily through private parties-such as Plaintiffs-acting as "private attorneys general." See S. Rep. No. 382, 95th Con,. 1st Sess. 5, ("[t]he committee views this legislation as primarily self-enforcing; consumers who have been subject to debt collection abuses will be enforcing compliance"); and *Jacobson v. Healthcare Fin. Servs.*, 516 F.3d 85, 91 (2d Cir. 2008) ("[i]n this way, the FDCPA enlists the efforts of sophisticated consumers like [Plaintiffs] as 'private attorneys general' to aid their less sophisticated Counterparts, who are unlikely themselves to bring suit under the Act, but who are assumed by the Act to benefit from the deterrent effect of civil actions brought by others.").

71. The actions of the Defendants enumerated above constitute an attempt to collect a debt or were taken in connection with an attempt to collect a debt within the meaning of the FDCPA.

72. The Defendants violated the following sections of the FDCPA: 15 U.S.C. §§ 1692e and 1692f. By way of example and not limitation Defendant violated the FDCPA by taking the following actions in an attempt to collect a debt or in connection with an attempt to collect a debt: using false, deceptive or misleading representations or means; threatening to take or actually taking an action prohibited by law; using any false, deceptive or misleading representations or means; using unfair or unconscionable means.

**SECOND CLAIM FOR RELIEF:**

**CONVERSION**

73. Plaintiffs repeat and reallege each and every allegation contained in the previous paragraphs as though fully set forth herein.

74. A cause of action for conversion lies when a Plaintiff establishes a) her legal ownership of a specific, identifiable piece of property, and b) the defendant's interference with her property interest in defiance of her rights.

75. Intent to possess another's property is not an essential element of conversion, nor does the converter need to take physical possession of the property. Any wrongful exercise of dominion over a piece of property by someone other than the owner constitutes a conversion.

76. Property subject to conversion includes readily identifiable funds from a bank account.

77. Here, Defendants froze Yainis Ynoa's bank account without any authority to do so. They knowingly and fraudulently exercised dominion over her funds, interfering with her right of possession and ability to use her money for her expenses, such as but not limited to paying bills and rent.

78. Yainis Ynoa gave notice of her legal ownership of the money in her account, and demanded its return and release.

79. Defendants' improper restraint of Yainis Ynoa's money for an unreasonable period of time without qualification, which harmfully interfered with her right to control her own property, constitutes conversion.

80. For these reasons, Plaintiff Yainis Ynoa is entitled to punitive damages, in addition to actual damages. Actual damages include, inter alia, loss of use of money for the period Defendants wrongfully exercised dominion and control over Yainis Ynoa's money, and resulting

consequential damages resulting therefrom. Yainis Ynoa suffered serious mental distress and disruption of her daily life.

## JURY DEMAND

81. Plaintiffs demand a trial by jury.

## PRAYER

82. WHEREFORE, Plaintiffs requests the following relief:

   a. A declaration that all Defendants have committed the violations of law alleged in this action;

   b. Statutory damages under 15 U.S.C. § 1692k;

   c. Reasonable attorney's fees and costs;

   d. Actual damages;

   e. Exemplary and punitive damages;

   f. Prejudgment and post judgment interest as allowed by law

   g. All other relief, in law and in equity, both special and general, to which Plaintiffs may be justly entitled.

Dated: Brooklyn, New York
       March 26, 2020

                                  Respectfully submitted,

                                  /s/

                                  Ahmad Keshavarz
                                  The Law Office of Ahmad Keshavarz
                                  16 Court St., 26th Floor
                                  Brooklyn, NY 11241-1026
                                  Phone: (718) 522-7900

Fax:    (877) 496-7809
Email: ahmad@NewYorkConsumerAttorney.com

Case 1:20-cv-02594-JGK   Document 1   Filed 03/26/20   Page 17 of 17